United States v. Del Campo. I hope you all don't mind, I just understand we've got cross appeals here and there was a lot going on. There was a proposal about how to wind up this argument, but I think we wanted to keep it simple and we can have our purposes served by just doing it this way. Separately? Yes. Thank you, Judge. Thank you, Mr. Cone. May it please the Court, I would like to begin this argument where defense counsel began closing argument at the trial of this case, and he began by pointing out that the defendant, my client, Mr. Del Campo, disclosed to the bank that he and the seller on the first transaction were one and the same. The witness told you it's two pockets in the same pair of pants, and that becomes important because the transaction was disclosed exactly that way and handled exactly that way with no hidden agenda, no hiding the ball, no misrepresentation. And while that's an able way to close, no misrepresentation, the better argument would have been, you see, good faith. They were disclosing what they were doing, but the district court had denied the defense request for a good faith instruction, and so defense counsel could not make a good faith argument referencing the good faith instruction. Defense counsel closed his closing argument by pointing out correctly that his client, Mr. Del Campo, did not steal money from the bank. He did everything he could to rescue the property. He didn't walk away, as the bank itself said. He was not a fraudster. Again, an able point to make by able counsel. But what's missing? What's missing is my client was acting in good faith. And that is why... Why doesn't the instruction that the jury has to find, beyond a reasonable doubt, that the government has proved that your client acted with an intent to defraud, with an intent to deceive or cheat someone, not take care of the issue? The words of this court's patterned jury instruction on good faith talk about an honestly held belief, an honestly held opinion. Lack of carelessness is not fraudulent purpose. And the instruction given said that it can't be something that's an accident or a mistake, but it has to be an intent to deceive. I'm wondering why that's not enough to inform the jury properly. Those are different words, the words I just read from the patterned jury instruction. I grant you that. They're different words. Different words usually refer to different concepts. There's a reason we use different words in the law. And the concepts of honestly held opinions and honestly held beliefs go more to what defense counsel was arguing in closing argument. Look, my client attempted to disclose to the bank what was going on here. My client showed the red flag to the bank. My client was not a fraudster. Did he say, and it sounds like I were arguing it, I might have immediately followed that with words like we had no intent to deceive, we had no intent to defraud. Did he say things like that? I'm sure he did. No misrepresentation was the way he put it. And there was a jury instruction, was there not, where the court instructed the jury that the two defendants' theories was that they contended that they did not intend to defraud the bank? Yes, Your Honor. But again, I come back to the point that I've already made, which is I believe that the good faith instruction and its words are different from the words that were in any of the jury instructions here. And that is why defense counsel was deprived of the opportunity to say my clients were do not convict them. And the misrepresentations, the alleged misrepresentations themselves were hotly disputed. The three essential misrepresentations were, alleged misrepresentations were that my client failed as to one transaction as to which he was the buyer. He was the buyer in only one of the three transactions. He was tangentially involved at most in the other two in which he was not the buyer. In the first transaction, he had said that it was his intent to use the house as his primary residence. The government claims that was a misrepresentation. But in fact, he produced a lease showing that he intended to rent his own home to his daughter at the time of the closing. So there was a basis for believing that he was acting in good faith here. Counsel, I read that and maybe I'm just missing it, but if you're going to lease a house to somebody else, how can that be your primary residence? To be clear, he was going to lease, the lease I referred to was his own house. He was going to, his own existing house to be able to move into. I see. Primary residence. Thank you. As to income, the record shows that his business income was in excess of $500,000. And if you add his personal income to that, you get to just about the number that he said in the bank documents in his request for authorization for the loan was his income. This is the kind of thing that lawyers can say he was acting in good faith in his statements to the bank to get the loan. And the, so all of this put together is reversible error. You have disputed facts. The jury should have an opportunity to say, to hear an instruction that when a person is acting in good faith, believing that he's disclosing to the bank what he ought to be disclosing, showing red flags where red flags ought to be shown, not stealing money, not a fraudster, and the issues are disputed as to whether or not this was misrepresented or that was misrepresented. After all, was he going to move into the house? Was he not going to move into the house? The jury should have an opportunity to look at the evidence and to get instructed. If you find good faith, if you find an honestly held belief, you can acquit. If your honors have no more questions, I will. Thank you, Mr. Kahn. We appreciate that. You've saved several minutes for rebuttal, and if you need a little extra time, we'll remember you giving us this time. Mr. Strafer. I'm going to police the court. Richard Strafer for Marshall King. Government has appealed the noncustodial sentence of a 71-year-old, now 72-year-old, retired lawyer with multiple health problems that the undisputed record shows would be life-threatening if he was in prison. Government claims on appeal that the sentence was substantively unreasonable because it was too far below the guideline score of 45 to 57 months, even though the prosecutor only made a general objection to the sentence and did not inform the district court of what he got wrong, and even though King did not profit from the crime, had no knowledge of the misrepresentation. What he got was pretty modest. I mean, he got some money, but it was pretty modest. Correct. He got his normal . . . It was basically a sham transaction, and he got what he would have gotten had it been an ordinary transaction. Right? Correct. But he didn't profit from, I guess, the fraud part of it. There was no reason for him to . . . He didn't profit in the way that the other defendant did. Correct. I do believe, though, that this case can and should be decided on the standard of review. The prosecutor did not file anything in the district court in response to the sentencing memorandum that requested a variance. The government put on no evidence challenging King's medical evidence or proffers. They put no evidence on that the BOP could deal with these problems, and after the sentence was imposed, all the prosecutor said was, quote, Your Honor, the government does object to the downward variance. He didn't say whether the objection was for procedural unreasonableness, substantive unreasonableness. We've never really decided this, but you know, when it's procedural reasonableness, it does seem to me that the objections have to be made in the district court. I think our precedents are pretty clear about that, but if it's substantive unreasonableness, that's the sort of thing that really you only raise for the first time on appeal. We haven't decided that, but it would seem to me, you said you were going with the standard of review. I thought you were going to be telling us that this is an abuse of discretion standard, and our review of substantive unreasonableness is deferential. Well, that's true as well. And he got some custody, right? So he had, was it six months of home confinement? Yes. What was it? It was one day of time served, which is really the day of processing, and then six months of home confinement, and restitution of five years of supervised release, and the restitution award of nearly one point. 71 years old, convicted nine years after the crime, no criminal activity in the interim, no criminal history, a low likelihood of recidivism, didn't really profit in the way that the other defendants did. Is that everything that's relevant in evaluating whether it was an abuse of discretion? Yes, those are the ones the district court cited. I would add that the trial counsel added some more factors, such as the no knowledge of the misrepresentations about the inflated income and assets of the co-defendants, and that the big culprit here was the banks themselves. Now, there's an issue about whether that's relevant, and I think as to the liability issue, the governor- I don't know about blaming the victims, how persuasive that's going to be. Correct. I agree with that in terms of the guilt phase. However, at sentencing, it is relevant, and this court in two cases, kind of the flip side of this, in Crisp, cited by the government, the court reversed a probationary sentence or a non-custodial sentence, in part because the victim was a small family-owned bank that was particularly vulnerable. In Livesy, the court reversed a probationary sentence because the innocent shareholders were billed to billions of dollars. I think if those things can be taken into account to enhance a sentence, then the reverse is also true, that here we have banks, and I've never been able to get my head around this, quite frankly, that at the very same time that the prosecutors here are saying that the underwriters would have not approved these loans, they're in New York arguing that the Countrywide was engaged in this massive fraud of underwriting and that they were intentionally circumventing the underwriters. So I think that that's something the court could and should take into account in terms of the reasonableness of the sentence. Well, if the district court didn't, it seems— The district court didn't mention it, and the district court didn't mention the objections or the arguments made by the prosecutor either, but I think this court can still take those into account in whether there was an abuse of discretion. The government has raised, by my count, five reasons why they think the judge abused the discretion, only two of which were ever mentioned in the district court. The first was that it said that the sentence did not recognize the seriousness of the offense sufficiently, and I think about that issue, I think that that makes relevant the fact that King didn't profit, that he didn't know about the misrepresentations, that the banks had already approved the loans before he ever got into the picture. The second objection the government makes is that it didn't give deterrence enough weight, because the court should be sending a message that professionals shouldn't engage in this kind of conduct, and I think that, again, this is where countrywide in Chase's conduct comes into play. Nobody got prosecuted in Chase or countrywide, so what message is the court sending when it sentences somebody like Mr. King, 72 years old, to prison and doesn't prosecute the real ringleaders of this massive fraud? This judge didn't have the power to decide who to prosecute or who not, right? That's true. Things are going on in New York. I mean, the judge should sentence based on the record, shouldn't he, not on newspaper accounts? Well, it's more than newspaper accounts, but I agree to a limited extent, however, when the prosecutor's argument as to why the trial judge erred, he said, well, you're not sending a message to the lowly people and the grunts that are doing these individual frauds. Well, the message is more complex than that. Now, the government also raises three additional arguments never mentioned by the prosecutor. First, they say unwarranted sentence disparity, and it cites statistics about how 70 percent of fraud defendants get prison time. Well, 30 percent don't, and there's no requirement that a judge sentence according to the norm. That's the whole point of the discretionary basis of sentencing. So I think the statistics actually prove my point, and I read the court said, this court said in Bonk, that a sentence is only unreasonable if it is outside the range of reasonableness. I would say that 30 percent of fraud defendants don't get any prison time. We are within the range of reasonableness. The government also accused the judge of unsound reasoning by saying he didn't really benefit from the offense. I think the record is clear that he, as we've already discussed, that all he got was his routine fees, and those actually went to his business. So we don't even know how much Mr. King actually got personally. Well, he keeps the client, right? Well, that may be. The government speculates that that was some sort of part of the motive, but there's no evidence of that in the record. That was the first time they ever mentioned that, is in their brief. The government also argues that the unsound reasoning was because they were speculating, as we were just saying, to keep clients happy. But then the judge said, but who knows for sure? So the judge really didn't rely on that issue. So the government's complaint that the judge had unsound reasoning, I think, is not supported by his comments. If there are no other questions, I'll say my rest for rebuttal. Thank you, Mr. Smith. I mean, Mr. Strafer, I apologize. You have, say, five minutes for rebuttal. Ms. Cannon. Good morning, and may it please the Court. Eileen Cannon on behalf of the United States. We believe the district court committed a clear error in judgment when it imposed a non-custodial sentence on Mr. King, a highly experienced and unremorseful title agent and attorney who played an instrumental role in a mortgage fraud scheme that caused nearly $1.4 million in bank losses. We see no compelling justification in the record or in the district court's rationale for a variance of this magnitude all the way down from a range of 46 to 57 months to less than one day imprisonment. What were you asking for? Do you want us to remand it and tell the district judge how to sentence Mr. King? We're seeking a remand for resentencing so the district court can reweigh the 3553A factors in a way that we hope would serve the purposes in that statute. We don't think this court needs to dictate the particular sentence now. That would be, again, in the discretion of the district court once it goes back down. When you say they should reweigh the factors, I mean, he did weigh them. So would you say weigh this one more than you did or weigh that one less than you did? Essentially, yes. We believe that he unreasonably balanced the factors because he so drastically minimized the seriousness of the offense. And then he elevated the defendant's individual characteristics so far above all the remaining statutory factors that he ultimately imposed an unreasonable sentence. So you agree that he should have weighed the personal characteristics and he should have weighed specific deterrence. I guess you're not complaining about specific deterrence. It's only general deterrence. That's correct, Your Honor. We're not taking the position that Mr. King himself is likely to commit further fraud. We don't think that's supported in the record. But we do believe that a very strong message in terms of general deterrence is necessary. And that's a principle that this court has been quite receptive of in the white-collar context, particularly in cases such as Crisp and Hayes. And I would point out that in those cases, you have defendants who pled guilty and cooperated and in many cases provided substantial and critical assistance. We have quite the opposite here. In fact, we have a defendant who the district court even commented showed no contrition. And the district court on two occasions, I think, in the transcript commented on how surprised the judge was by that lack of acknowledgment. So he weighed that and he had that before him to weigh it as well. Yes, and it sort of kind of begs the question what the defendant would have received if he, in fact, had shown some remorse. I don't know how much further it could have gone.  Can you tell me a little bit about how you look at sending a message as opposed to the concept of general deterrence? You know, Sam Goldwyn used to say about movies, if you want to send a message, use Western Union. It kind of grates on me to say that a judge in a criminal sentencing should be talking about sending messages to the world. But how do you distinguish that from general deterrence? When I say send a message, I mean the classical interpretation of general deterrence, which is providing a significant enough threat to would-be white-collar criminals not to engage in this type of deliberate and calculated fraud in the future. Are you saying that it's going to take a bigger sentence for some other 71-year-old man who's going to lose his law license anyway to deter them from that, that prison on top of that is really necessary? You know, it is necessary because the standard is no greater than necessary. Yes, Your Honor. We believe a meaningful term of incarceration in this case is necessary, and it wouldn't be greater than necessary. And the reason for that, I mean, just factually speaking, Mr. King was roughly 60 years old when he committed these three counts of bank fraud, which we submit are quite serious offenses, each of which carries a 30-year statutory maximum. They're all Class B felonies for which probation isn't even statutorily an option. So he was, I think, mature enough to commit the crimes when he was roughly 60 years old, and none of his personal characteristics, either alone or in combination, make his circumstances or this case so extraordinarily unusual to justify a variance all the way down to basically a few hours in jail for the day of processing. Did you put on any evidence to contest his medical evidence? No, Your Honor. The motion for a downer variance was that the crux of that was that Mr. King would require a higher-level designation within the Bureau of Prison, and it was very much a resource-driven argument about this imposing added, basically an added drain on the federal government. It was never an argument about BOP not being able to manage his health conditions, and the district court, when it referenced his health, just said very generally, quote, serious medical issues. There was no, or significant medical issues, I think. There was really no record developed as to whether BOP could handle that claim, and that's precisely because that was never the argument raised by Mr. King. And so, yes, the government didn't put on particular evidence to suggest that BOP could in fact handle it, but there was never a claim that BOP could not. If I could just briefly respond to some of the discussion regarding the amount of gain with respect to Mr. King. It is true sort of that if you look at the discrete financial gain on these three transactions, it is not a lot of money, and we acknowledge that, but I think . . . I mean, that really is a big contrast for him versus other cases, financial crimes cases, where we have ruled that the sentence was substantively unreasonable, right? I mean, this elderly lawyer who loses his license has a federally conviction, only got his usual fee, but is nevertheless now jointly and severally liable for the full amount of restitution is not really in the same position as someone who is the CEO of a corporation or CFO and participated in a billion-dollar accounting fraud, that kind of situation. Yes, Your Honor. I understand that the dollar sums can be viewed, I think, more offensively, obviously, in those more egregious cases in terms of discrete financial gain, but I would urge this Court not to look so exclusively on that dollar sum figure because I think it really does obscure the real harm here. We're talking about $3.65 million in fraudulent loans that were dispersed by these banks were it not for Mr. King's role in this offense, and ultimately an actual loss of almost $1.4 million. I think that makes this case quite serious when you look at the loss amount. Also, looking just at the customary gain, I think needs to be viewed in the context of what we have, which is an ongoing professional relationship in a title business, which is a sort of built-on repetition. And even if you take the district court's rationale, which is he was, quote, just doing this to make his law partner clients happy, that to me connotes at least some inherent profit motive for future business. I'd also say that this type of argument that I only made customary fees is something that's routinely made in the mortgage fraud context when we're talking about title agents and title attorneys, and it really never persuades because they, and Mr. King in particular, are operating from a position of trust. He's a highly experienced lawyer with almost 40 years' experience doing these types of closings, and for him to glaringly violate that trust, not just once but three times, I think sets his case apart in a certain way. And also the fact that in most of those cases that you're referencing where the dollar sums are higher, you have defendants who cooperate and provide critical assistance. And then I would finally urge this court to look at CRISP. It is a pre-Gaul case, but I think factually it's probably most similar to ours insofar as the loss amount there is roughly half a million dollars. The defendant there acted at the supervision of his, I'm sorry, at the direction of his supervisor, and there's no evidence that that defendant gained anything beyond his standard salary as an employee. So I think sort of too restrictive of a view on the financial gain here obscures the true harm cause when somebody of Mr. King's stature as a highly experienced lawyer blatantly violates his fiduciary duty three times in the context of three very serious crimes. I want to also respond briefly to the notion of the six months home confinement. That is part of the sentence, but we just feel that qualitatively it cannot serve the purpose of general deterrence in any way that a meaningful term of incarceration would. And so we just don't think it changes the calculus whatsoever. We do believe this sentence truly falls outside the range of reasonable outcomes, and we ask this court to vacate it as substantively. Chris, there was five hours of imprisonment followed by five years of supervised relief. Does it matter that here there's six months of home confinement? I don't believe it does, Your Honor. Qualitatively speaking, the threat of spending six months in one's home, particularly in the case of Mr. King, who's a retired individual, closed his law practice in 2012 and wasn't even, I don't believe, practicing law at the time this trial even took place. I just think that sentence, the six months home confinement component, doesn't change the substantive unreasonableness of the sentence, which is truly a drastic deviation from a sizable guideline range with no compelling justification in the record. If Your Honors have no further questions, the government asks that this court affirm the convictions as to both defendants, vacate the sentence as substantively unreasonable, and remand for resentencing. Thank you. Thank you, Ms. Cannon. Which means also that we don't need to hear any rebuttal about something that wasn't raised. I don't think Mr. Cohn really has anything to rebut, and Mr. Strafford can get straight to the reasonableness of the sentence. Well, first I'd like to say that the grounds for the departure or the variance do not have to be extraordinary, as the government just argued. As to the cases they've cited, Chris, in addition to being pre-Gaul, the major reason it was reversed was not simply the sentence itself, but because the judge had put too much weight on the payment of restitution. And also in that case, as I also pointed out in my initial argument, the court also was concerned because the victim there was a small family-owned bank that was particularly vulnerable. So we're back to the issue of if we're going to look at the victim, let's look at the victims here. As to BOP, it wasn't Mr. King's duty to say the BOP could not handle his problems. That was the government's burden. And this came up, frankly, in Musgrave, a Sixth Circuit case, and went up twice to the Sixth Circuit. The government cites the first reversal. And what's interesting here, and that goes back to whether it should be plain error review, the prosecutor objected in that case at sentencing that the judge didn't consider deterrence enough. Sixth Circuit reverses to give the judge a chance. Well, the prosecutor here didn't make that objection. And if he had, maybe the judge would have made an explanation. But in any event, it goes back up. The judge gives the same sentence, probation, again, and that was a fraud of two banks, guidelines were 57 to 71 months, more than here. The sentence was one day served, five years of supervised release, two years of home confinement and a fine, and restitution. In particular, the court disregarded BOP's ability. In that case, the government actually argued that BOP had the ability, and the Sixth Circuit said no based on a 2015 GAO report about how the BOP can't really take care of elderly prisoners. So there's plenty of evidence out there that the BOP couldn't really handle this, and the government didn't try to prove it. So I think that we're back to the point that it's their burden. They're the ones that had to show that this was unreasonable. So they had the burden to prove that. And as to the loss amount and the seriousness of the offense, I just have to come back to the fact that these loans had already been approved by the banks before King got involved. And countrywide, the underwriters had twice rejected it, and they were overruled by management, and we kind of now know why. But to say that this makes King responsible for the seriousness of the offense, I think, is inaccurate. Nothing further? Are you arguing against the restitution amount for King? Well, yeah. I'll briefly mention about the restitution because, again, it does bother me that we're going to reward and call victims these two banks. And as to countrywide in particular, we brought up – I know this would be only reviewable for plain error, but we now know that the Bank of America bought Countrywide's asset at probably a bargain price in 2009. So the victim here already got two. The problem with getting into all of this is you're raising really an argument that the government's not had an opportunity to respond to. So we've got your brief on that, Mr. Strafer, and we appreciate your argument. Thank you.